T.C. Memo. 2006-185

UNITED STATES TAX COURT

HELEN M. KORCHAK, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 170-04, 13315-06.   Filed August 30, 2006.

<u>Robert W. Lynch</u>, for petitioner.

<u>Gerald A. Thorpe</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:   Pursuant to <u>Madison Recycling Associates v. Commissioner</u>, T.C. Memo. 2001-85, affd. 295 F.3d 280 (2d Cir. 2002), respondent assessed against petitioner and petitioner's spouse Ernest I. Korchak (Mr. Korchak) a deficiency of $140,388 in their Federal income tax (tax) for their taxable year 1982. In a so-called affected items notice of deficiency (affected

items notice), respondent determined for the taxable year 1982 of petitioner and Mr. Korchak additions to tax under sections[1] 6653(a)(1)(A),[2] 6653(a)(1)(B),[2] and 6659 of $7,019.40, 50 percent of the interest due on an assessed deficiency of $140,388, and $34,322.10, respectively.[3]

The only issue remaining for decision is whether petitioner is entitled to relief under section 6015(b) or, in the alternative, under section 6015(f) with respect to her taxable year 1982. We hold that petitioner is entitled to relief under section 6015(b) with respect to that year.

---

[1]All section references are to the Internal Revenue Code in effect for the year at issue.

[2]In Korchak v. Commissioner, T.C. Memo. 2005-244, see infra note 3, respondent conceded that the affected items notice incorrectly referred to sec. 6653(a)(1)(A) and (B), instead of to sec. 6653(a)(1) and (2).

[3]On Feb. 28, 2005, respondent and petitioner entered into a stipulation to be bound (stipulation to be bound) by the final decision in Korchak v. Commissioner, docket No. 22105-03. That case, which was based upon the affected items notice issued to petitioner and Mr. Korchak, was commenced in the Court by Mr. Korchak. The issue presented there was whether the deficiency in tax that respondent assessed pursuant to Madison Recycling Associates v. Commissioner, T.C. Memo. 2001-85, affd. 295 F.3d 280 (2d Cir. 2002), for the taxable year 1982 of petitioner and Mr. Korchak is subject to additions to tax under secs. 6653(a) and 6659. In the opinion that the Court issued in the case involving Mr. Korchak, Korchak v. Commissioner, T.C. Memo. 2005-244, the Court sustained respondent's determinations under secs. 6653(a) and 6659. On Oct. 20, 2005, the Court entered its decision in that case, which became final on Jan. 18, 2006. In the stipulation to be bound, petitioner retained the right to assert that she is entitled to relief under sec. 6015(b) or (f) with respect to her taxable year 1982.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found except as stated herein.

Petitioner resided in Bryn Mawr, Pennsylvania, when she filed the petitions.

Petitioner was born in Australia in 1937. Mr. Korchak was born in Czechoslovakia in 1934. In 1939, Mr. Korchak moved with his family to the Netherlands. In 1952, Mr. Korchak moved with his family to Australia, where he met petitioner. In 1959, petitioner and Mr. Korchak married (and remained married as of the time of the trial) and moved to the United States.

In 1958, petitioner received a B.S. degree in biochemistry from the University of Melbourne. In 1962, she received a Ph.D. in physiology from Tufts University. As of the time of the trial, petitioner had never taken any tax, financial, or accounting courses.

In 1957, Mr. Korchak received a B.S. degree in chemical engineering from the University of Melbourne. In 1964, he received a Sc.D. in chemical engineering from the Massachusetts Institute of Technology (MIT). Mr. Korchak audited an economics class and an accounting class when he was studying at MIT.

During the period 1964 to 1976, petitioner was a full-time homemaker and mother. From 1976 until 1986, petitioner worked as a research scientist for New York University (NYU). From 1986

until at least the time of the trial, petitioner worked as a research scientist for the University of Pennsylvania. At the time of the trial, her annual salary from the University of Pennsylvania was $115,000.[4] As of that time, petitioner intended to retire in 2007.

In 1964, Mr. Korchak began working for Halcon International, Inc. (Halcon). He worked for that company or one of its subsidiaries until 1986 when Halcon and its subsidiaries ceased business operations. During the first few years Mr. Korchak worked for Halcon, he was involved in research and development. His duties included developing chemical processes and determining whether such processes were economically feasible. If, after a relatively short period of time, the processes that were being developed did not appear to be economically feasible, no further work was done with respect to such processes.

During 1981, Mr. Korchak was president of Halcon Research and Development Corporation, a subsidiary of Halcon that was involved in research and development. Sometime during 1981, Mr. Korchak became president of Scientific Design Corporation, another subsidiary of Halcon that was involved in engineering, and held that position during 1982.

_____

[4]During 2004, the year before the trial took place, petitioner received her salary from the University of Pennsylvania, the amount of which is not disclosed by the record, and other unidentified income totaling $270.

During 1981 and 1982, Mr. Korchak received compensation and other taxable distributions from Halcon and/or its subsidiaries (collectively, Halcon distributions) totaling $1,539,269 and $466,309, respectively. Petitioner and Mr. Korchak made a considered judgment not to change their family's lifestyle in any way as a result of Mr. Korchak's having received such distributions. They made that judgment because they did not want to spoil their children by having a lavish lifestyle. Mr. Korchak invested a large portion of the Halcon distributions that he received during 1981 and 1982. Although petitioner was generally aware that Mr. Korchak invested a large portion of such distributions, she was not aware of the specific investments that he made.

From the time in 1986 when Halcon and its subsidiaries ceased business operations and no longer employed Mr. Korchak until around 1995, Mr. Korchak received very little income. Starting in 1990 until at least the time of the trial, Mr. Korchak worked for Performance Coatings Corporation (Performance), a new company that he and several others started in that year. Mr. Korchak received very little, if any, compensation from that company during the first several years of its existence. At the time of the trial, Mr. Korchak, who was 71 years old, was president of Performance for which Performance paid him

an annual salary of $90,000.[5] As of that time, Mr. Korchak had no intention of retiring.

Based on their respective personal and business backgrounds and experiences, petitioner and Mr. Korchak believed throughout their marriage that managing their family's finances should be Mr. Korchak's responsibility and that Mr. Korchak was better suited than petitioner to do so. Petitioner and Mr. Korchak also believed throughout their marriage that maintaining their home and rearing their three children[6] should be petitioner's respon- sibility and that petitioner was better suited than Mr. Korchak to do so. Consequently, throughout the marriage of petitioner and Mr. Korchak, (1) Mr. Korchak assumed the responsibility of managing their family's finances, and petitioner relied upon him to do so; and (2) petitioner assumed the responsibility of maintaining their home and rearing their three children, and Mr. Korchak relied on her to do so.

As part of his responsibility for managing the family's finances, Mr. Korchak made all the family's financial decisions. He did so without discussing those decisions with petitioner. If

---

[5]During 2004, the year before the trial took place, Mr. Korchak received a salary of $91,000 from Performance and the following income: (1) A distribution of $13,586 from an individ- ual retirement account (IRA), (2) $19,166 of Social Security payments, and (3) a distribution of $26,981 from a pension.

[6]The three children of petitioner and Mr. Korchak were born in 1965, 1967, and 1969, respectively.

petitioner had made any inquiries concerning the financial decisions that Mr. Korchak made for their family, Mr. Korchak would not have withheld any information from her with respect to such decisions.

Throughout their marriage, petitioner was generally unaware of bank accounts or brokerage or other investment accounts in Mr. Korchak's name alone or in the names of Mr. Korchak and petitioner. During 1982, petitioner was not aware of any brokerage accounts that Mr. Korchak may have had at that time. At least during 1982, petitioner was aware of two joint checking accounts in the names of Mr. Korchak and herself. At least during 1982, petitioner's salary from NYU of approximately $15,000 (petitioner's NYU salary) was deposited into one of those two joint checking accounts (joint checking account into which petitioner's NYU salary was deposited), and petitioner used that joint checking account to pay certain personal and household expenses. The joint checking account into which petitioner's NYU salary was deposited was also used to pay any mortgage loan on the family residence in which she and Mr. Korchak were living.

At all relevant times, Mr. Korchak was responsible for opening and reviewing all the family's mail, including bills, tax notices, documents pertaining to investments and other financial matters, and bank statements, including any joint checking account statements, and petitioner relied upon him to do so.

Prior to 1980, Mr. Korchak's investment portfolio consisted of stocks and bonds. During 1980, Mr. Korchak became a client of Marcus V. Cole (Mr. Cole), who at that time worked for Merrill Lynch and who was deceased at the time of the trial. During that year, petitioner and Mr. Korchak purchased rental property located on Hilton Head Island. In 1981, without consulting petitioner, Mr. Korchak invested in a bus rental activity (Mr. Korchak's bus rental investment) and three oil and gas partnerships (Mr. Korchak's three oil and gas partnership investments).[7] Although Mr. Korchak did not consult petitioner before he invested in that bus rental activity and those partnerships, he may have mentioned to her that he had invested in a bus rental activity. However, he would not have provided any details about that activity to petitioner.

During 1982, Mr. Cole joined the staff of Hamilton Gregg & Company, Inc. (Hamilton Gregg), a company engaged in the business of providing financial planning advice to its clients. On or about December 6, 1982, Mr. Korchak became a client of Hamilton Gregg, and Mr. Korchak's primary contact person at that company was Mr. Cole.

On or about November 24, 1982, Mr. Cole delivered a private offering memorandum (private offering memorandum) to Mr. Korchak

---

[7]Mr. Korchak's three oil and gas partnership investments were Kelly-Brock Drilling Partners 1981-1, Odyssey Partners 81 Limited Partnership, and Matagorda Limited Partnership II.

with respect to a partnership called Madison Recycling Associates (Madison Recycling). According to the private offering memorandum, Madison Recycling was a New York limited partnership formed on October 1, 1982, that was to lease, as lessee, steam chest molded expanded polystyrene recycling equipment called Sentinel EPS Recyclers (EPS Recyclers). The private offering memorandum further indicated that Madison Recycling and two other entities were to engage in a joint venture in which the EPS Recyclers were to be used in a process designed to recycle scrap polystyrene. According to the private offering memorandum, the recycled polystyrene was to be sold on the open market, and Madison Recycling was to receive a share of the profits from such sales.

Mr. Korchak considered in some detail whether to invest in Madison Recycling. That was because he knew a lot about the business of recycling technologies. In considering whether to invest in Madison Recycling, Mr. Korchak was also aware that Congress was encouraging investment in recycling in order to conserve energy.

After considering in detail whether to invest in Madison Recycling, on November 30, 1982, without consulting petitioner, Mr. Korchak purchased an interest in Madison Recycling for $75,000 (Mr. Korchak's Madison Recycling investment). Mr. Korchak did not use the joint checking account into which petitioner's NYU salary was deposited in order to purchase Mr.

Korchak's Madison Recycling investment. Instead, he utilized a cash management account (cash management account) that he used to purchase all of the investments that he made.[8]

Petitioner became aware of Mr. Korchak's Madison Recycling investment on February 2, 1986, when she and Mr. Korchak signed Form 872, Consent to Extend the Time to Assess Tax (Form 872), with respect to their taxable year 1982. That form stated in pertinent part:

> The amount of any deficiency assessment is to be limited to that resulting from any adjustment to: (A) the taxpayer's distributive share of any item of income, gain, loss, deduction, or credit of, or distribution from Madison Recycling, (B) the tax basis of the taxpayer's interest(s) in the aforementioned partnership(s) or organization(s) treated by the taxpayer(s) as a partnership, (C) any gain or loss (or the character or timing thereof) realized upon the sale or exchange, abandonment, or other disposition of taxpayer's interest in such partnership(s) or organization(s) treated by the taxpayer as a partnership, (D) items affected by continuing tax effects caused by adjustments to any prior tax return, and (E) any consequential changes to other items based on such adjustment.

In 1986, without consulting petitioner, Mr. Korchak purchased a majority interest in Riverside Polymer Systems, Inc. (Riverside), and ultimately invested approximately $700,000 in that company. In 1989, Riverside filed for bankruptcy. As a result of that bankruptcy proceeding, Mr. Korchak lost his entire

---

[8]It is not clear from the record whether the cash management account was held (1) at a bank or another type of financial institution and (2) in the joint names of petitioner and Mr. Korchak.

investment in that company.  It was only after Riverside filed for bankruptcy in 1989 that petitioner became aware that Mr. Korchak had invested approximately $700,000 in that company.

As was true of petitioner's reliance on Mr. Korchak with respect to their family's finances, petitioner also relied upon Mr. Korchak to retain a professional to prepare joint tax returns for them.  Petitioner's role in the preparation of such returns was limited to providing Mr. Korchak with any Forms W-2, Wage and Tax Statement (Form W-2), and Internal Revenue Service (IRS) information returns that she received as well as any other tax-related information that she had.

Since around the mid-1970s until the time of the trial, the professional that Mr. Korchak retained to prepare Form 1040, U.S. Individual Income Tax Return, for petitioner and himself (joint tax return) was Hilton Sokol (Mr. Sokol), a certified public accountant.  Mr. Sokol was an employee of Miller, Ellin and Company (Miller Ellin) in New York, which provided accounting services for, inter alia, Halcon.  Many of Halcon's executives retained certified public accountants employed by Miller Ellin to prepare their respective tax returns.  Both petitioner and Mr. Korchak trusted and relied on Mr. Sokol's professional judgment to prepare accurately their joint tax returns.

Since around the mid-1970s, the following general practice remained the same with respect to (1) the preparation of joint

tax returns for petitioner and Mr. Korchak, including the joint tax return for their taxable year 1982, and (2) the review, signing, and filing of such returns. Mr. Sokol prepared a joint tax return for Mr. Korchak and petitioner based on any Forms W-2, IRS information returns, and other information provided to him by Mr. Korchak. Thereafter, Mr. Sokol gave that joint tax return to Mr. Korchak who reviewed it. After Mr. Korchak reviewed and approved the joint tax return that the return preparer prepared, Mr. Korchak presented that return to petitioner for her signature. In presenting such joint tax return to petitioner, Mr. Korchak had it open to the page on which petitioner and he were to sign it. Before petitioner signed the joint tax return that Mr. Korchak presented to her, Mr. Korchak did not discuss its contents with her, and petitioner did not review, or make any inquiries about, such return. The signature of the return preparer on the joint tax return that Mr. Korchak presented to petitioner indicated to her that such return was prepared accurately.

On April 28, 1983, the return preparer signed the joint tax return for the taxable year 1982 of petitioner and Mr. Korchak (1982 joint tax return). The return preparer then sent that return to Mr. Korchak.

The 1982 joint tax return showed, inter alia, the following:

|  | Amount Reported |
|---|---:|
| Wages, salaries, tips, etc. | [1]$481,648 |
| Interest income | 55,633 |
| Dividends | 13,034 |
| Refunds of State and local income taxes | 6,056 |
| Business income or (loss) from Schedule C | [2](24,961) |
| Capital gain or (loss) from Schedule D | (3,000) |
| Supplemental gains or (losses) from Form 4797 | (1,283) |
| Rents, royalties, partnerships, estates, trusts, etc. from Schedule E | (220,695) |
| Other income | 11,352 |
| Total income | 317,784 |
| Adjusted gross income | 310,932 |
| Itemized deductions | 47,846 |
| Taxable income | 258,086 |
| Tax | 116,492 |
| Total tax | 116,492 |
| Investment credit from Form 3468 | 116,492 |
| Balance | 0 |
| Minimum tax | 3,064 |
| Tax from recapture of investment credit | 134 |
| Total Tax | 3,198 |
| Total payments | 96,168 |
| Refund | 92,970 |

[1]Of the $481,648 of wages, salaries, tips, etc., petitioner received $15,339.46, and Mr. Korchak received the balance.
[2]The entire loss of $24,961 from Schedule C, Profit or (Loss) From Business or Profession, was with respect to Mr. Korchak's bus rental investment.

Of the loss of $220,695 from Schedule E, Supplemental Income Schedule (Schedule E), claimed in the 1982 joint tax return, $189,965 was attributable to certain claimed partnership losses (claimed partnership losses of $189,965) that were not identified in Schedule E, and the balance was attributable to two claimed

rental losses (viz., a claimed rental loss of $7,627 with respect to property located on Hilton Head Island and a claimed rental loss of $22,383 with respect to a property identified as "Evian") and windfall profit tax withheld in 1982 of $720.

Schedule E had the following notation with respect to the claimed partnership losses of $189,965: "SEE STATEMENT 2". Statement 2 showed, inter alia, the following partnerships and the following claimed loss of each such partnership that gave rise to the total claimed partnership losses of $189,965 shown in Schedule E:

| Name of Partnership | Partnership Loss |
|---|---|
| Kelly-Brock Drilling Partners 1981-1[1] | $64,753 |
| Odessey Partners 81 Limited Partnership[1] | 57,087 |
| Matagorda Limited Partnership II[1] | 10,036 |
| Madison Recycling | 58,089 |

[1]Petitioner and Mr. Korchak also claimed losses with respect to Mr. Korchak's three oil and gas partnerships for their taxable year 1981.

There was nothing about the claimed $58,089 Madison Recycling loss that would have made that claimed loss stand out in relationship to the other partnership losses claimed in the 1982 joint tax return.

Statement 2 also showed for each of the partnerships identified below the following amount as "PROPERTY QUALIFIED FOR INVESTMENT CREDIT NEW RECOVERY PROPERTY - OTHER":

| Name of Partnership | Property Qualified for Investment Credit New Recovery Property - Other |
|---|---|
| Kelly-Brock Drilling Partners 1981-1 | $11,447 |
| Odessey Partners 81 Limited Partnership | 8,161 |
| Matagorda Limited Partnership II | 1,246 |
| Madison Recycling | 577,500 |

Neither Schedule E nor Statement 2 referred to Form 3468, Computation of Investment Credit (Form 3468), that was included as part of the 1982 joint tax return.

Form 3468, "PART II. - Qualified Investment", showed the following:

| | | | (1) | (2) | (3) | (4) |
|---|---|---|---|---|---|---|
| **1** Recovery Property | | Line | Class of Property | Unadjusted Basis | Applicable percentage | Qualified Investment (Column 2 x column 3) |
| Regular Percentage | New Property | (a) | 3-year | | 60 | |
| | | (b) | Other | 598,354 | 100 | 598,354 |
| | Used Property | (c) | 3-year | | 60 | |
| | | (d) | Other | | 100 | |
| * | * | * | * | * | * | * |

**5 Total qualified investment in 10% property -** Add lines 1(a) through 1(h), 2, 3, and 4 (See instructions for special limits)[9] . . . . . . . . . . . . . . . . . . . . . .  598,354

Form 3468, "PART III. - Tentative Regular Investment Credit", showed the following:

---

[9]No entries were made on lines 1(e) through 1(h) and lines 2 through 4 of Form 3468.

**8** 10% of line 5 . . . . . . . . . . . . . . . . . . . .    59,835

       \*      \*      \*      \*      \*      \*      \*

**14** Current year regular investment credit - Add lines 8
through 13[10]. . . . . . . . . . . . . . . . . . . . . .    59,835

       \*      \*      \*      \*      \*      \*      \*

**17** Tentative regular investment credit - Add lines 14, 15,
and 16[11] . . . . . . . . . . . . . . . . . . . . . . .    59,835

Form 3468, "PART IV. - Tax Liability Limitations", showed

the following:

**18 a** Individuals - From Form 1040, enter tax from line 38,    )
page 2, plus any additional taxes from Form 4970 . . . . )
  **b** Estates and trusts - From Form 1041, enter tax from line )
26a, plus any section 644 tax on trusts . . . . . . . . .)    116,492
  **c** Corporations (1120 filers) - From Form 1120, Schedule    )
J, enter tax from line 3 . . . . . . . . . . . . . . . . )
  **d** Other organizations - Enter tax before credits from     )
return . . . . . . . . . . . . . . . . . . . . . . . . . )

**19 a** Individuals - From Form 1040, enter credits from lines 41)
and 42 of page 2 . . . . . . . . . . . . . . . . . . . . .)
  **b** Estates and trusts - From Form 1041, enter any foreign   )
tax credit from line 27a . . . . . . . . . . . . . . . . )
  **c** Corporations (1120 filers) - From Form 1120, Schedule    )      0
J, enter any foreign tax credit from line 4(a), plus    )
any possessions tax credit from line 4(f) . . . . . . . .)
  **d** Other organizations - Enter any foreign or possessions   )
tax credit . . . . . . . . . . . . . . . . . . . . . . . )

**20** Income tax liability as adjusted (subtract line 19 from line
18). . . . . . . . . . . . . . . . . . . . . . . . . . . .    116,492

**21 a** Enter smaller of line 20 or $25,000. See instruction for
line 21 . . . . . . . . . . . . . . . . . . . . . . . . .    25,000
  **b** If line 20 is more than $25,000 - Enter 90% of the
excess . . . . . . . . . . . . . . . . . . . . . . . . . .    82,343

**22** Regular investment credit limitation - Add lines 21a
and 21b . . . . . . . . . . . . . . . . . . . . . . . . .    107,343

**23** Allowed regular investment credit - Enter the smaller of
line 17 or line 22 . . . . . . . . . . . . . . . . . . . .    59,835

---

[10]No entries were made on lines 9 through 13 of Form 3468.

[11]No entries were made on lines 15 and 16 of Form 3468.

**24** Business energy investment credit limitation - Subtract line 23 from line 20 . . . . . . . . . . . . . . . . . . . . . . . . . 56,657

**25** Business energy investment credit - From line 14 of Schedule B (Form 3468) . . . . . . . . . . . . . . . . . . . . . . . . . 57,750

**26** Allowed business energy investment credit - Enter smaller of line 24 or line 25 . . . . . . . . . . . . . . . . . . . . . . . . 56,657

**27** Total allowed regular and business energy investment credit - Add lines 23 and 26.  Enter here and on Form 1040, line 43; Schedule J (Form 1120), line 4(b), page 3; or the proper line on other returns . . . . . . . . . . . . . . . . . . . . 116,492

Form 3468, Schedule B, Business Energy Investment Credit (Schedule B), referred to on line 25 of "PART IV. - Tax Liability Limitations" of Form 3468, showed the following:

| (1)<br>Type of<br>Property | | (2)<br>Class of<br>property<br>or life<br>years | (3)<br><br><br><br>Code | (4)<br><br><br>Unadjusted<br>basis/Basis | (5)<br><br><br>Applicable<br>Percentage | (6)<br>Qualified<br>investment<br>(Column 4 x<br>column 5) |
|---|---|---|---|---|---|---|
| Recovery | (a) | 3-Year | | | 60 | |
| | (b) | Other | C | 577,500 | 100 | 577,500 |
| Nonrecovery | (c) | 3 or more<br>but less<br>than 5 | | | 33 1/3 | |
| | (d) | 5 or more<br>but less<br>than 7 | | | 66 2/3 | |
| | (e) | 7 or more | | | 100 | |

**2** Total 10% energy investment property - Add lines 1(a) through 1(e), column (6) . . . . . . . . . . . . . . . . . . . . 577,500

\*       \*       \*       \*       \*       \*       \*

**7** Enter 10% of line 2 . . . . . . . . . . . . . . . . . . . . . . 57,750

\*       \*       \*       \*       \*       \*       \*

**11** Current year business energy investment credit - Add lines
   7 through 10[12] . . . . . . . . . . . . . . . . . . . . . . . . .    57,750

        *      *      *      *      *      *      *

**14** Tentative business energy investment credit - Add lines
   11 through 13.[13] Enter here and on line 25 of Form
   3468 . . . . . . . . . . . . . . . . . . . . . . . . . . . .    57,750

The following appeared on the bottom of Schedule B of Form

3468:

| TYPE OF PROPERTY | 3-YEAR | OTHER | NONRECOVERY |
|---|---|---|---|
| C - RECYCLING | | 577,500. | |

It was not obvious from reviewing Form 3468 (1) that $57,750

of the $59,835 investment tax credit shown in Form 3468, "Part

III. - Tentative Regular Investment Credit", was attributable to

Madison Recycling and (2) that the $56,657 business energy

investment tax credit shown in Schedule B of Form 3468

was attributable to Madison Recycling.  (For convenience, we

shall sometimes refer collectively to the claimed $57,750 invest-

ment tax credit attributable to Madison Recycling and the claimed

$56,657 business energy investment tax credit attributable to

Madison Recycling as the claimed Madison Recycling tax credits of

$114,407.)

Prior to the preparation of the 1982 joint tax return, Mr.

Korchak never sought or received any tax advice from Mr. Sokol

---

[12]No entries were made on lines 8 through 10 of Schedule B
of Form 3468.

[13]No entries were made on lines 12 and 13 of Schedule B of
Form 3468.

with respect to Madison Recycling.  The only information that Mr.
Korchak provided to Mr. Sokol with respect to Madison Recycling
before that return was prepared was Schedule K-1, Partner's Share
of Income, Credits, Deductions, Etc., that Madison Recycling
issued to Mr. Korchak (Madison Recycling 1982 Schedule K-1 issued
to Mr. Korchak).[14]

The information set forth in the Madison Recycling 1982
Schedule K-1 issued to Mr. Korchak was consistent with the
information that Madison Recycling reported in Form 1065, U.S.
Partnership Return of Income, for its taxable year ended December
31, 1982 (Madison Recycling's 1982 return) that Madison Recycling
filed with the IRS on March 14, 1983.  In Madison Recycling's
1982 return, Madison Recycling claimed, inter alia, a loss of
$704,111 (Madison Recycling's claimed $704,111 loss).  In Form
3468, included as part of Madison Recycling's 1982 return,
Madison Recycling claimed a basis of $7,000,000 for both invest-
ment tax credit purposes and business energy investment tax
credit purposes (Madison Recycling's claimed $7,000,000 basis for
investment tax credit purposes and business energy investment tax
credit purposes).

If petitioner had asked Mr. Korchak before she signed the

---

[14]The parties stipulated and attached as an exhibit to the
parties' stipulation of facts a copy of the 1982 joint tax return
that petitioner and Mr. Korchak filed with the IRS.  That return
did not include Madison Recycling 1982 Schedule K-1 issued to Mr.
Korchak.

1982 joint tax return about the claimed $58,089 Madison Recycling loss and the claimed Madison Recycling tax credits of $114,407, which she did not, Mr. Korchak would have assured her that that claimed loss and those claimed credits were proper.

On May 1, 1983, petitioner and Mr. Korchak signed the 1982 joint tax return, and on May 6, 1983, they filed it with the IRS.

On or about December 24, 1987, respondent issued a Notice of Final Partnership Administrative Adjustment to Madison Recycling's tax matters partner for, inter alia, Madison Recycling's taxable year ended December 31, 1982 (FPAA). In the FPAA, respondent, inter alia, disallowed Madison Recycling's claimed $704,111 loss and reduced to $0 Madison Recycling's claimed $7,000,000 basis for investment tax credit purposes and business energy investment tax credit purposes (respondent's reduction to $0 of Madison Recycling's claimed basis).

On February 16, 1988, respondent sent a copy of the FPAA to Mr. Korchak and petitioner in an envelope addressed to both of them. Consistent with his practice of opening the family's mail, Mr. Korchak opened that envelope and reviewed the FPAA. He showed the FPAA to petitioner because he believed that she should be aware that the IRS had raised questions about Madison Recycling's 1982 return, which, in turn, raised questions about the claimed $58,089 Madison Recycling loss and claimed Madison Recycling tax credits of $114,407 in their 1982 joint tax return.

On May 17, 1988, a partner other than the tax matters partner commenced a case in the Court contesting the adjustments made in the FPAA. Ultimately, the parties in that case agreed on the adjustments made in the FPAA, but they disagreed over whether the IRS timely issued the FPAA. Madison Recycling Associates v. Commissioner, T.C. Memo. 2001-85. On April 9, 2001, the Court issued its Opinion addressing that dispute and held that the period for limitations for assessment had not expired and that the FPAA was timely. Id. On August 1, 2001, pursuant to that Opinion, the Court entered a decision sustaining, inter alia, respondent's disallowance of Madison Recycling's claimed $704,111 loss and respondent's reduction to $0 of Madison Recycling's claimed basis. That decision was affirmed on appeal. Madison Recycling Associates v. Commissioner, 295 F.3d 280 (2d Cir. 2002).

Pursuant to Madison Recycling Associates v. Commissioner, T.C. Memo. 2001-85, on October 3, 2003, respondent assessed against petitioner and Mr. Korchak a deficiency of $140,388 in tax for their taxable year 1982 and interest thereon of $1,107,797.85 as provided by law resulting from the disallowance of the claimed $58,089 Madison Recycling loss and the claimed Madison Recycling tax credits of $114,407.[15] As of the time of

---

[15]In computing the liability for interest as of Oct. 3, 2003, respondent used the increased interest rate applicable to underpayments attributable to tax-motivated transactions estab-
(continued...)

the trial, no part of that assessed deficiency or that assessed interest had been paid.

Respondent issued an affected items notice to petitioner and Mr. Korchak with respect to their taxable year 1982. In that notice, respondent determined that petitioner and Mr. Korchak are liable for their taxable year 1982 for additions to tax under sections 6653(a)(1)(A),[16] 6653(a)(1)(B),[16] and 6659 of $7,019.40, 50 percent of the interest due on an assessed deficiency of $140,388, and $34,322.10, respectively.

In response to the affected items notice, Mr. Korchak filed a petition with the Court in the case at docket No. 22105-03. See supra note 3.

In response to the affected items notice, petitioner filed a petition with the Court. In that petition, petitioner claimed that she is entitled to relief under section 6015 with respect to the additions to tax that respondent determined for her taxable year 1982 as well as interest thereon as provided by law.

On July 30, 2004, respondent filed a motion to remand herein (respondent's motion to remand). In that motion, respondent stated, inter alia:

> 4. Respondent has not considered petitioner's request for relief under I.R.C. § 6015. Specifically, respondent has not made a determination with respect to

---

[15](...continued)
lished by sec. 6621(c).

[16]See supra note 2.

relief under I.R.C. § 6015(f).

5. Petitioner's counsel has indicated that petitioner is seeking relief under I.R.C. § 6015(b) and (f).

\*      \*      \*      \*      \*      \*      \*

7. Respondent requests this Court grant his motion to remand so that he may have an opportunity to make a determination with respect to petitioner's claim for relief from joint and several liability under I.R.C. § 6015(b) and (f).

On August 10, 2004, the Court denied respondent's motion to remand but continued the trial. On August 11, 2004,[17] respondent's counsel referred petitioner's request for relief under section 6015 to respondent's Cincinnati Service Center.

On or about November 11, 2004, petitioner sent to respondent Form 8857, Request for Innocent Spouse Relief (And Separation of Liability and Equitable Relief), with respect to her taxable year 1982 (petitioner's Form 8857). Petitioner attached to petitioner's Form 8857 Form 12510, Questionnaire for Requesting Spouse (Form 12510), a preprinted form. The preprinted Form 12510 contained several parts identified as Part 1 through 5. The instructions to Part 1 of Form 12510 stated: "Complete this

_____

[17]The parties stipulated that respondent referred petitioner's request for relief under sec. 6015 to respondent's Cincinnati Service Center on Aug. 11, 2003, and not on Aug. 11, 2004. That stipulation is clearly contrary to the facts that we have found are established by the record, and we shall disregard it. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989). The record establishes, and we have found, that respondent referred petitioner's request for relief under sec. 6015 to the Cincinnati Service Center on Aug. 11, 2004.

part for **all** requests for relief".  The instructions to Part 2 of Form 12510 stated:  "Complete this part if you are requesting relief for a **balance due** shown on your return when filed, but not paid."  The instructions to Part 3 of Form 12510 stated:  "Complete this part if you are requesting relief for **additional tax as a result of an IRS examination"**.

In Form 12510 that petitioner attached to petitioner's Form 8857 (petitioner's Form 12510), petitioner provided the responses indicated to the following questions in Part 1 of petitioner's Form 12510 with respect to the filing and preparation of the 1982 return:

2.   What is the current marital status between you and
     the (ex)spouse with whom you filed the joint
     return(s) for the year(s) you are requesting
     relief

     ☒ Married and living together

          *      *      *      *      *      *      *

3.   Why did you file a joint return instead of your
     own separate return

     I did not make a decision whether to file a joint
     return or a separate return.  The tax returns were
     always prepared by my husband and a CPA.  The
     filing status was already completed when I was
     told to sign the return.

4.   What was your involvement in the preparation of
     the return(s)

     I had no involvement at all in the preparation of
     the return.  I gave my husband my W-2 for the tax
     year and signed the return when he told me to do
     so.

5.   Did you review the tax return(s) before signing.
     ☐ Yes      ☒ No

     If no, explain why not

     My husband handles all the financial, banking and
     tax matters for us.  He is a business man and
     company executive.  In 1982, I was married to him
     for 23 years and I always trusted him in these
     matters.  I was busy raising three young boys,
     managing our house hold, and working full time.

     *       *       *       *       *       *       *

7a.  During the year(s) in question did you have **your
     own separate** bank account(s).  ☐ Yes      ☒ No
     ☐ Checking   ☐ Savings   ☐ Other

     My husband had some separate accounts, I did
     not.

     *       *       *       *       *       *       *

8a.  During the year(s) in question did you and your
     (ex)spouse have any **joint** bank account(s).
     ☒ Yes      ☐ No

     If yes, indicate the type of account(s).
     ☒ Checking      ☐ Savings      ☐ Other

     A joint account for household matters.  My husband
     had other separate accounts.

8b.  What access did you have to the account(s)

     My salary was automatically, electronically
     deposited into the joint checking account.  I did
     not review monthly bank statements, my husband
     did.  I used the account to pay for groceries and
     some household expenses.

8c.  What funds were deposited to the account(s)

     My salary was electronically, automatically
     deposited into the account, and I believe my
     husband made some deposits also.

\*       \*       \*       \*       \*       \*       \*

8e.   What bills were paid out of the account(s)

I paid for groceries, clothing for me and the
children, and household necessities.  My husband
paid other monthly household expenses.  He had
other separate accounts I was not aware of in
1982.

8f.   Who wrote the checks

I wrote some checks for groceries, clothes and
some household expenses.  My husband also wrote
checks and managed the account.  He picked up the
mail.  I did not see the monthly bank statements.

8g.   Did you review the monthly bank statements
☐ Yes     ☒ No

8h.   Did you balance the checkbook to the bank
statements
☐ Yes     ☒ No

9.    Did you pick up and open the household mail
☐ Yes     ☒ No

\*       \*       \*       \*       \*       \*       \*

12.   What was your highest level of education during
the year(s) you are requesting relief.
Note any business or tax-related courses you
completed by that time.

I am a research scientist with a Ph.D.  I also ran
the household, was the primary care giver, and
worked full time.  My education was in the field
of physiology.  I never had any business courses
or business experience.

13.   What was your (ex)spouse's highest level of
education during the year(s) you are requesting
relief.
Note any business or tax-related courses he or she
completed by that time.

My husband also has a Doctorate of Science.  He is
an engineer and had business experience as a

company executive.  He managed our financial affairs and all tax matters.  I had no idea he invested in Madison Recycling or that it had tax implications.

14.  What business experience did you have during the year(s) you are requesting relief

None.

15.  Have any assets been transferred from your (ex)spouse to you.  ☒ Yes     ☐ No
If yes, list the assets and the date of transfer. Explain why they were transferred to you.

In 1987, before I learned about any tax problems, we had wills prepared.  The estate planning attorney advised us to each have separate assets. Our residence was transferred from joint ownership to me.  My husband already had other assets in his name.

16.  How was the extra money from the unpaid taxes spent

I did not receive any money from a tax refund.  I later learned my husband used the refund to form a new start up company called Riverside Polymer Systems, Inc.  The company went bankrupt in 1989 and the investment was lost.

17.  Explain any other factors you feel should be considered for granting relief

During 1982, I was completely consumed with raising three sons, ages 17, 15, and 13.  I was a post doctorate research assistant working in the field of immunology.  I did not have time or knowledge about business or tax matters to be involved in those areas.  My husband always took it upon himself to manage financial/tax affairs and it was not my place to do so.  [Reproduced literally.]

Petitioner did not complete Part 2 of petitioner's Form 12510.  That was because petitioner is not seeking relief under

section 6015 with respect to an underpayment of tax for her taxable year 1982. Petitioner is seeking relief under section 6015 with respect to an understatement of tax for that year.

In Part 3 of petitioner's Form 12510, petitioner provided the responses indicated to the following questions with respect to petitioner's knowledge of any items that caused the understatement:

1a. At the time of signing, were you concerned about any item(s) omitted from or reported on the return(s)

☐ Yes    ☒ No

\*       \*       \*       \*       \*       \*       \*

1c. At that time, describe how much you knew about each of the incorrect item(s)

I did not know anything at all about the corrected item, Madison Recycling, LLC. As previously stated, I knew the return was prepared by our accountant, a CPA, and by my husband of then 23 years. I signed the return when asked because I trusted my husband completely. I believed that since it had been reviewed and prepared by a CPA and my husband, that everything was correct.

2. At the time of signing, if you were not concerned about any item(s), when and how did your first become aware of the incorrect item(s)

In 1988, the IRS sent a notice to us with a large proposed 1982 tax liability because it intended to disallow a deduction related to Madison Recycling. I never knew about my husband's investment in Madison Recycling and the tax deduction until then when he informed me for the first time.

Part 4 of Form 12510 listed, inter alia, various income items and various expense items. For example, the various income

items listed in Part 4 of Form 12510 included wages, rent, interest, and dividends. The various expense items listed in Part 4 of Form 12510 included rents, mortgage loans, food, and utilities. The instructions to Part 4 of Form 12510 stated: "If you completed Part 2, complete this part. If you completed Part 3, completing this part is optional. However, doing so now may expedite consideration of your claim." Pursuant to those instructions, petitioner did not complete Part 4 of petitioner's Form 12510. That was because, pursuant to the instructions to Part 2 of Form 12510, petitioner was not required to, and did not, complete Part 2 of petitioner's Form 12510 since petitioner is not seeking relief under section 6015 with respect to an underpayment of tax for her taxable year 1982. Petitioner is seeking relief under section 6015 with respect to an understatement of tax for that year.

Petitioner attached Form 12507, Innocent Spouse Statement (petitioner's Form 12507), to petitioner's Form 8857. An attachment to petitioner's Form 12507 (petitioner's attachment to petitioner's Form 12507) stated in pertinent part:

> In 1964, Ernest [Mr. Korchak] accepted a position with Halcon International, Inc., in Little Ferry, New Jersey, and the couple [petitioner and Mr. Korchak] moved to Hackensack. Their first child was born that year. Helen [petitioner] discontinued her work outside the home to be a full-time mother and homemaker. In 1967, the couple's second child was born and, in 1969, their third and final child was born. During the years between 1964 through 1976, Helen was a full-time homemaker. In 1969, the Korchak's moved from Hackensack,

NJ, to Westport, Connecticut.

In 1976, Helen Korchak returned to her post-doctoral studies and was hired as a research scientist to conduct research at New York University under a grant from the National Institute of Health.  During 1979 through 1980, Helen held a post-doctoral fellowship with the Arthritis Foundation, conducting immunology research while still being the primary homemaker and care provider for her family.

As Ernest rose to more and more responsible positions with Halcon, he decided to engage the services of Merrill Lynch as a financial advisor.  In 1982, Ernest received a substantial dividend distribution from Halcon.  He sought advice that year from Merrill Lynch, which put him in touch with Hamilton Gregg, a financial advisory group.  Hamilton Gregg recommended the purchase of Madison Recycling, a company that had developed environmentally friendly recycling technology.  Ernest always had a strong interest in protecting the environment and was attracted by the investment possibilities, coupled with tax incentives.  In 1982, Ernest purchased a limited partnership interest in Madison Recycling based on the advise of Merrill Lynch.  He did so without consulting Helen or discussing his interest in various other investment possibilities with her.  Helen Korchak had no idea that Ernest purchased a limited partnership interest in Madison Recycling, or even as to the nature of Madison Recycling's business operations, until 1988, six years after the 1982 investment.  In 1982, Helen earned $15,339.00.  Ernest earned $466,309.00.

Halcon went out of business in 1986, at a time when there were no employment possibilities for people in Ernest's field with his experience.  He was aware of a small company, Riverside Polymer Systems, Inc., which was in financial difficulty.  The company specialized in waterborne coating technology intended to replace solvent-based coatings.  Ernest thought the company could become profitable and bought a majority interest in Riverside.  He investment approximately $700,000.00 in Riverside, using his savings, including the 1982 federal income tax refund, and money from re-mortgaging the family home.  Unfortunately, the acceptance of waterborne technology was slower than expected.  Riverside struggled for about three years before Ernest had

to declare the company bankrupt in 1989.  He lost his entire investment and the 1982 refund.

During their entire marriage, Ernest took exclusive charge of all financial matters, giving Helen money weekly for groceries and household necessities.  While she at times wrote checks for groceries, family clothing, and household necessities, the monthly bank account statements were maintained and reviewed solely by Ernest.  Helen was engrossed during these years as a post-graduate student, a homemaker and mother.  Her time was fully consumed by raising her children, maintaining the household and performing scientific research work as an immunologist, first at New York University from 1976 through 1986, and then at the University of Pennsylvania from 1986 through the present.  She never studied business or accounting.

While Helen was aware that income tax returns had to be prepared and filed each year, her only role was to provide Ernest with a copy of her W-2 form during those years in which she worked.  On the other hand, Ernest was an engineer with business skills, who held a very responsible executive/management position.  Finances were always an area of interest to him.  He regarded the management of family financial affairs as his sole responsibility.  He undertook to engage the services of a highly reputable accountant in 1966, an accountant who was providing services to his employer and to other management personnel at Halcon during those years.

Just as she did during all the years of their marriage, Helen followed the instruction and direction of her husband to simply sign the 1982 tax return once it had been prepared by their accountant and presented to her for signing.  During forty-five years of what could only be described as a wonderful, trusting marriage relationship, Ernest Korchak perceived his role as having sole responsibility for the financial affairs of the family.

During the tax year in question, 1982, Helen Korchak was completely consumed by her responsibilities as a mother of three children, then ages 17, 15, and 13, as a homemaker, and by her passionate interest in her medical research in the field of immunology.  As an engineer and corporate executive/businessman, Ernest

had decided that financial matters were his sole responsibility and did not seek to discuss tax matters or investments with Helen.  When he had questions, he discussed issues with his accountant and with his financial advisor, trusting upon their judgment.

As mentioned above, Helen Korchak first became aware of Ernest's investment in Madison Recycling in 1988, when Ernest showed her a February 16, 1988 notice from the Internal Revenue Service * * *.  Prior to that time, she had no knowledge or awareness that Ernest claimed a loss from his Madison recycling investment in 1982.  She admittedly did not review the Form 1040 individual income tax return when it was presented to her for signing where marked.  It had been prepared by Ernest and a certified public accountant, and she trusted her husband's judgment.  It was not until Ernest showed Helen the notice from the Internal Revenue Service in 1988 that she became aware of the tax loss claimed and the refund generated.  She never received any financial benefit from the refund.  Ernest used the entire refund proceeds as a loan or capital contribution for a new startup company, Riverside Polymer Systems, Inc., that filed for bankruptcy in 1989 and was ultimately liquidated.  In total, not known to Helen until after the fact, Ernest loaned or invested $700,000.00 by the time it was ultimately lost in bankruptcy.

Helen Korchak is eligible for retirement.  She has a retirement fund that she has long contributed to.  Unfortunately, she is now faced with the prospect of a horrific federal tax liability in excess of $2 million, with interest and penalties.  Should she be punished for being a loving, trusting wife, a homemaker and mother who also had career aspirations and a keen interest in science?  Had she asked any questions about Madison Recycling, her husband and the accountant would have reassured her.  She never benefited from her husband's decision to invest in Madison Recycling.  The 1982 tax refund was lost as part of her husband's investment in a new startup company.  Her husband controlled the family's finances and tax return preparation.  All the facts recited herein concerning the 1982 tax return were not learned by Mrs. Korchak until 1988 through the present.  Considering the equities in this matter, it would be unduly harsh to find Mrs. Korchak liable for the 1982 tax in question.  It would be egre-

gious to take away her retirement at an age when she earned that right. The innocent spouse relief was designed for these circumstances. Your favorable consideration and finding that Mrs. Korchak is indeed an innocent spouse is respectfully requested. [Reproduced literally.]

Sometime between October 8, 2004, and January 10, 2005, respondent received from Mr. Korchak Form 12508, Questionnaire for Non-Requesting Spouse, with respect to petitioner's taxable year 1982 (Mr. Korchak's Form 12508). In Mr. Korchak's Form 12508, Mr. Korchak provided the responses indicated to the following questions with respect to taxable year 1982:

1. What is the marital status between you and the (ex)spouse with whom you filed the joint return~~(s)~~ for the year~~(s)~~ relief is being requested?

   ☒ Married and living together

   *       *       *       *       *       *       *

2. Why did you file a joint return instead of your own separate return?

   I always filed married-joint upon the advice of my CPA.

3. What was your involvement in the preparation of the return(s)? For example, did you gather the receipts and cancelled checks, just provide your W-2's, etc.

   I gathered all the W-2's; K-1's; 1099's, receipts, etc and sent them on to my CPA

4. Did your (ex)spouse review the tax return(s) before signing? ☐ Yes   ☒ No

4a. If no, explain why not.

   Preparation of the return has always been my responsibility - Helen has always trusted me and

my CPA to prepare the tax return properly

4b.  If yes, did your (ex)spouse ask you or the return
     preparer for an explanation of any items or
     amounts on the tax returns?

     N/A

     *       *       *       *       *       *       *

5.   During the year(s) in question, did you have your
     own separate bank account(s)?  ☐ Yes      ☒ No

     *       *       *       *       *       *       *

6.   During the year(s) in question did you and your
     (ex)spouse have any joint bank account(s)?
     ☒ Yes      ☐ No

     If yes, indicate the type of account(s).


     ☒ Checking      ☐ Savings      ☐ Other

6a.  What access did your (ex)spouse have to the
     account(s)?  (For example, permitted to make
     deposits, write checks and withdraw funds)?

     Helen's paycheck was directly deposited & she
     would write checks for groceries * * * [and
     professional expenses.]

6b.  What funds were deposited to the account(s)?

     Our wages:  in 1982 my wages were $466,309 * * *
     while Helen's were $15,339 * * *

6c.  Who made these deposits?

     I believe we used direct deposit.

6d.  What bills were paid out of the account(s)?

     All household bills

6e.  Who wrote and signed the checks?

     I was the primary bill payer.  I believe Helen

wrote check for groceries & professional expenses

6f.  Did you review the monthly bank statements?

☒ Yes     ☐ No

6g.  Did you balance the checkbook to the bank statements?

☒ Yes     ☐ No

7.  Did you pick up and open the household mail?

☒ Yes     ☐ No

8.  Identify any periods of separation between you and your (ex)spouse during the year(s) in question.

None

9.  What was your highest level of education during the year(s) in question?
Note any business or tax related courses you completed by that time.

Sc.D in chemical engineering from MIT.  No business or tax related courses.

10.  What was your (ex)spouse's highest level of education during the year(s) in question?
Note any business or tax related courses he or she completed by that time.

Ph.D in physiology from Tufts University.  No business or tax related courses.

11.  Have any assets been transferred from you to your (ex)spouse?     ☒ Yes     ☐ No

If yes, list the assets and the date of transfer. Explain why the assets were transferred.

9/14/87.  Transfer of principal residence from joint ownership solely to my wife.  For estate planning reasons, in order to utilize our estate tax exemptions

*     *     *     *     *     *     *

12a. Was your (ex)spouse aware of any financial problems you were having such as bankruptcy, high credit card debt or difficulty paying monthly living expenses? If yes, please explain.

I did not have any financial problems at the time.

13. If the tax years in question were audited, what items, if any, changed? Were the changed items yours or your (ex)spouse's? (For example, unreported income, disallowed deductions, unclaimed credits)

The audit of my LTD. partnership [Madison Recycling] disallowed my deduction and tax credits. This was solely my investment.

* * * * * * *

15. If the items changed by the audit were yours, did your (ex)spouse benefit from them? Explain.

No: The losses and tax credits resulted in a refund of my withholdings. The refund was invested in another business venture of mine which failed in 1990. [Reproduced literally.]

On December 15, 2004, respondent received a memorandum from petitioner's attorney of record herein (petitioner's December 15, 2004 memorandum). Petitioner's December 15, 2004 memorandum set forth (1) factual contentions that are substantially the same as those set forth in petitioner's attachment to petitioner's Form 12507 and (2) legal arguments that are substantially the same as those set forth in the posttrial briefs that petitioner filed herein. Petitioner's December 15, 2004 memorandum also stated in pertinent part:

In 1982, unknown to Helen Korchak [petitioner], her husband Ernest [Mr. Korchak] invested in various

partnerships and claimed a Schedule E loss in the amount of $220,695.00 on their Form 1040 joint income tax return. Mr. and Mrs. Korchak's Form 1040 for 1982, together with schedules, consists of 36 pages! There were also losses and investment credits for Schedule C activity for rental of buses that generated a loss deduction of $24,961.00, and net short-term and long-term loss deductions for U.S. Treasury Bills. The Schedule E deductions consisted of a $64,753.00 loss from Kelly-Brock Drilling Partners, a $57,087.00 partnership loss from Odyssey Partners, a $10,036.00 partnership loss from Matagorda Ltd., a $58,089.00 partnership loss from Madison Recycling Associates, and a $30,010.00 loss from two rental properties. From all those various, sophisticated investments, the Internal Revenue Service disallowed only the loss deduction from Madison Recycling Associates, which resulted in the deficiency at issue.

In 1988, Ernest showed Helen a February 16, 1988 Notice from the Internal Revenue Service disallowing the Madison Recycling Associates loss claimed on their 1982 income tax return. Until then, Helen had no awareness or knowledge of Ernest's various investments. Helen's only knowledge about the 1982 income tax return was to provide Ernest with a copy of her W-2 reporting wages in the amount of $15,339.00. As of today, the disallowed Madison Recycling Associates loss and tax credits, with interest and penalties, result in an asserted deficiency exceeding two and one half million dollars ($2,500,000). The potential tax liability exceeds the net value of the Korchak's assets. At age 67, Helen could be faced with Internal Revenue Service collection activity that could levy upon her entire pension benefits and her home - a terrible hardship for reporting her $15,339.00 wages on a joint income tax return. * * *

* * * * * * *

- Her husband purchased interests in various partnerships and only the loss deduction from one investment, Madison Recycling Associates, was disallowed

- Funds for the purchase came from her husband's income

- Her husband maintained separate accounts for his investments that Helen did not have access to [Reproduced literally.]

After conducting an examination, respondent's examiner prepared workpapers dated January 10, 2005, in which that examiner concluded that petitioner was not entitled to relief under section 6015 for her taxable year 1982. The workpapers of respondent's examiner stated in pertinent part:

## GENERAL INFORMATION

Helen M. Korchak [petitioner] has filed a valid Form 8857 requesting relief of the understatement for tax year 1982. TP's are still married and maintaining a home together and are not considering divorce or separation.

## SPOUSE'S RESPONSE

NRS [Mr. Korchak] states he handled all financial matters and the RS [petitioner] trusted him and they both trusted the CPA to prepare the return properly.

## EVALUATION PROCESS

**Year 1982**
**IRC 6015(b)**
Liability arose before July 22, 1998
A balance was due as of July 22, 1998
RS did not make payments before July 22, 1998
Understatement of tax
Taxpayers are currently not divorced, widowed or legally separated, and did not live apart prior to the claim-relief is not available under IRC 6015(c)
Filed a joint return
Joint return is valid
There is enough information to determine the claim
Balance due remaining
RS did not sign the amended return or a waiver
There was a defaulted Statutory Notice of Deficiency in the RS's name-unagreed assessment
No OIC accepted
Claimed filed timely

Over $1,500 of understatement-full scope
Understatement of tax attributable to both spouses
Erroneous items:  Disallowed partnership losses on TP's
joint Schedule E
RS's attribution does not meet the attribution
exceptions.  This portion will be denied under IRC
6015(f).
Continue IRC 6015(b) for the portion attributable to
the NRS

**Knowledge factors:**
Background:
 RS-Education: Ph.D. in Physiology.  NRS-Education: Doctorate
    Occupation: Research Scientist.      of Science in
                                         Chemical Engineering.
                                         Occupation: Executive.

Involvement:
 RS-RS states there was a joint      NRS-NRS states he was
    checking account for household      the primary bill
    matters and that the NRS had        payer and that he
    other separate accounts.  RS        managed the account,
    states she used the joint           balanced the check-
    account to write checks for         book, reviewed the
    groceries, clothing for             monthly bank state-
    herself and the children and        ments and picked up
    household necessities.              and opened the
                                        household mail.

Lifestyle changes:        None indicated.

NRS's elusiveness:        No evidence of elusiveness or
                          deceit.  NRS states he
                          gathered all information and
                          sent it to the CPA. He states
                          the preparation of the return
                          had always been his
                          responsibility.  He states the
                          RS did not ask questions that
                          she trusted him and the CPA.

Duty to inquire:          RS states she did not review
                          the return when signing.  She
                          states the NRS handles all
                          financial matters and she
                          trusted him and the CPA.  She
                          states she was busy raising
                          three boys, managing

their household and working full time.

Living arrangements: Lived together entire tax year. TP's are married and continue to maintain their home together.

RS had constructive knowledge of all erroneous items when return was signed

Explanation: RS has failed to establish that she had no knowledge or reason to know of the overstated deductions. She failed to satisfy her duty to review the return and to inquire as to the content. The return resulted in a refund of $95,488.96.[18]

**Claim denied under IRC 6015(b)**

\*      \*      \*      \*      \*      \*      \*

**IRC 6015(f)**

**Eligibility factors:**

Evaluating the portion of deficiencies attributable to the NRS only
Relief is not available under IRC 6015(b) & 6015(c)
Filed a joint return
Liability unpaid, or RS may have refundable payments
Not a fraudulent return
No fraudulent transfer of assets
No disqualified assets transferred

**Tier II factors:**

Taxpayers are currently not divorced, widowed or legally separated, and did not live apart prior to the claim for at least 12 consecutive months

No economic hardship                                    **Against**

---

[18]The 1982 joint tax return claimed a refund of $92,970.

Explanation:                    Economic hardship is not indicated.  TP's are still married and continue to maintain their home together.  They continue to file joint returns through the most recently filed tax year and the joint TXI is $227,674.00

No marital abuse

No poor mental or physical health

No legal obligation established

RS had knowledge or reason to know          **Against**
Explanation:                    RS failed to satisfy her duty to review the return or to inquire.  The return showed an adjusted gross income of over $300,000.00, a tax liability of only $3198 and a refund of $92,970.  RS' had reason to know there was a substantial loss taken.

No significant benefit gained                 **For**
Explanation:                    No significant benefit evident.

Made a good faith effort to comply with        **For**
the tax laws
Explanation:                    RS is compliant.  TP's have continued to file joint tax returns through the most recently filed tax year.

Unique circumstances:          TP's state that in 1987 prior to receiving notice of the deficiency on this tax year and as part of their estate planning, the ownership of the primary residence was transferred from joint ownership to the RS's individual ownership.

Not meeting Tier II factors - deny claim

Tier II consideration:   Based on the above facts it is equitable to hold the RS liable for the balance.  RS failed to establish marital status or economic hardship, there are no extenuating circumstances such as abuse, poor health or legal obligation and RS had reason to know.

**Tier II factors not met - deny**

**Claim denied under IRC 6015(f) - full scope**

CONCLUSION

1982 - Denied under 6015(b),(c),(f)  [Reproduced literally.]

At the time of the trial, petitioner and/or Mr. Korchak owned the following properties:

| Owner | Type of Property | Value |
|---|---|---|
| Petitioner | Personal Residence[1] | $750,000 |
| Petitioner | IRA | 195,220 |
| Petitioner | Investment Insurance Trust | 9,509 |
| Petitioner | 1999 Saturn Automobile | 3,500 |
| Petitioner | Checking Account | 59,000 |
| Petitioner | House Contents | 10,000 |
| Petitioner | CRI[2] | 1,000 |
| Petitioner | Annuity Contract | 466,345 |
| Petitioner and Mr. Korchak | Joint Checking Account | 28,000 |
| Mr. Korchak | IRAs | 448,595 |
| Mr. Korchak | Boat | 1,000 |
| | Total | $1,972,169 |

[1]From Aug. 15, 1986, until Sept. 14, 1987, petitioner and Mr. Korchak owned as tenants by the entirety the residence in which they were living.  On Sept. 14, 1987, for estate planning reasons, Mr. Korchak transferred to petitioner for no consideration his interest in the residence in which they were living.
[2]The record does not indicate what "CRI" means.

At the time of the trial, the residence in which petitioner and Mr. Korchak were living that petitioner owned was subject to liabilities totaling $139,000.[19]

Petitioner filed a second petition with the Court with respect to her taxable year 1982. In that petition, petitioner claimed that she is entitled to relief under section 6015 with respect to the deficiency in tax assessed against petitioner and Mr. Korchak for their taxable year 1982 as well as interest thereon as provided by law.

OPINION

Section 6015(b)

Introduction

Petitioner claims that she is entitled to relief under section 6015(b) for her taxable year 1982.[20] Section 6015(b) provides in pertinent part:

> SEC. 6015. RELIEF FROM JOINT AND SEVERAL LIABILITY ON JOINT RETURN.
>
> *   *   *   *   *   *   *
>
> (b) Procedures For Relief From Liability Applicable to All Joint Filers.--
>
> (1) In general.--Under procedures prescribed by the Secretary, if-

---

[19]The record does not disclose whether petitioner or Mr. Korchak had any other liabilities at the time of the trial.

[20]In the alternative, petitioner claims relief under sec. 6015(f) for her taxable year 1982.

(A) a joint return has been made for a taxable year;

(B) on such return there is an understatement of tax attributable to erroneous items of 1 individual filing the joint return;

(C) the other individual filing the joint return establishes that in signing the return he or she did not know, and had no reason to know, that there was such understatement;

(D) taking into account all the facts and circumstances, it is inequitable to hold the other individual liable for the deficiency in tax for such taxable year attributable to such understatement; and

(E) the other individual elects (in such form as the Secretary may prescribe) the benefits of this subsection not later than the date which is 2 years after the date the Secretary has begun collection activities with respect to the individual making the election,

then the other individual shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such understatement.

Section 6015(b)(1) is similar to section 6013(e)(1). We may look at cases interpreting section 6013(e)(1) for guidance when analyzing parallel provisions of section 6015. See Jonson v. Commissioner, 118 T.C. 106, 119 (2002), affd. 353 F.3d 1181 (10th Cir. 2003). The failure by a spouse requesting relief (request-ing spouse) under section 6015(b) to satisfy any of the require-ments of that section prevents such spouse from qualifying for

such relief. <u>Alt v. Commissioner</u>, 119 T.C. 306, 313 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004).

The parties agree that petitioner satisfies section 6015(b)(1)(A), (B), and (E). Petitioner argues, and respondent disputes, that she satisfies section 6015(b)(1)(C) and (D).

<u>Section 6015(b)(1)(C)</u>

Pursuant to section 6015(b)(1)(C), petitioner must establish that in signing the 1982 joint tax return she did not know, and had no reason to know, of the understatement of tax in that return attributable to the claimed $58,089 Madison Recycling loss and the claimed Madison Recycling tax credits of $114,407 (understatement in the 1982 joint tax return).

Respondent does not dispute that in signing the 1982 joint tax return petitioner did not have actual knowledge of the understatement in the 1982 joint tax return. The parties dispute whether in signing the 1982 joint tax return petitioner had reason to know of the understatement in the 1982 joint tax return.

According to respondent, petitioner had constructive knowledge of the items reported in the 1982 joint tax return. Respondent is correct that a taxpayer who signs a tax return without reviewing it is charged with constructive knowledge of its contents. See <u>Bokum v. Commissioner</u>, 94 T.C. 126, 148 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). We must nonetheless determine whether in signing the 1982 joint tax return petitioner

had reason to know of the understatement in the 1982 joint tax return.  In making that determination, we bear in mind that a requesting spouse has reason to know of an understatement if a reasonably prudent taxpayer under the circumstances of the requesting spouse at the time of signing a tax return could have been expected to know that the tax liability stated in such return was erroneous or that further investigation was warranted. Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Shea v. Commissioner, 780 F.2d 561, 566 (6th Cir. 1986), affg. in part and revg. in part on another ground T.C. Memo. 1984-310; Bokum v. Commissioner, supra.

In resolving whether in signing a tax return a requesting spouse had reason to know of the understatement in such return, we consider whether the requesting spouse was aware of the circumstances of the transaction(s) that gave rise to the error(s) in such return.  See Bokum v. Commissioner, supra at 145-146.[21]  In making that determination, we may examine several factors, including:  (1) The requesting spouse's level of education; (2) the requesting spouse's involvement in the family's financial affairs; (3) the nonrequesting spouse's evasiveness and deceit concerning the family's financial affairs; and (4) the presence of expenditures that are lavish or unusual when compared to the requesting spouse's past standard of living.  See Stevens

---

[21]See also Hillman v. Commissioner, T.C. Memo. 1993-151.

v. Commissioner, supra; Butler v. Commissioner, 114 T.C. 276, 284 (2000); Flynn v. Commissioner, 93 T.C. 355, 365-366 (1989). (We shall hereinafter refer to the above factors as the education factor, the involvement in financial affairs factor, the evasiveness and deceit factor, and the lavish or unusual expenditures factor, respectively.)

We now address whether at the time of signing the 1982 joint tax return petitioner was aware of the circumstances of the transactions in which Madison Recycling engaged that resulted in the understatement in the 1982 joint tax return. See Bokum v. Commissioner, supra.[22] At the time she signed the 1982 joint tax return, petitioner was not even aware of Mr. Korchak's Madison Recycling investment, let alone the circumstances of the transactions in which Madison Recycling engaged that resulted in Madison Recycling's erroneously claimed $704,111 loss and erroneously claimed $7 million basis for investment tax credit purposes and business energy investment tax credit purposes.[23]

---

[22]See also Hillman v. Commissioner, supra.

[23]Madison Recycling's erroneously claimed $704,111 loss and erroneously claimed $7 million basis for investment tax credit purposes and business energy investment tax credit purposes, in turn, resulted in Mr. Korchak's erroneously reporting in the 1982 joint tax return the claimed $58,089 Madison Recycling loss, the claimed $577,500 of basis attributable to Madison Recycling for investment tax credit purposes and business energy investment tax credit purposes, and the claimed Madison Recycling tax credits of $114,407.

We find the instant record to be materially distinguishable from Bokum v. Commissioner, supra. In Bokum, we found that the requesting spouse should have been alerted by the tax return preparer's failure to sign the tax return in question. Id. at 148. In contrast, we have found herein that the 1982 joint tax return was signed by a return preparer and that the signature of the return preparer on that return indicated to petitioner that such return was prepared accurately. Moreover, in Bokum, we found that at the time the requesting spouse signed the return in question she was aware of the sale of a ranch, the tax treatment of which was at issue, and that a cursory review of the tax return would have brought to the requesting spouse's attention the distribution resulting from that sale as well as the tax treatment of that distribution. Id. at 146-147. In contrast, we have found herein that at the time petitioner signed the 1982 joint tax return she was not even aware of Mr. Korchak's Madison Recycling investment. We have also found (1) that there was nothing about the claimed $58,089 Madison Recycling loss that would have made it stand out in relationship to the other part- nership losses claimed in the 1982 joint tax return and (2) that it was not obvious from reviewing Form 3468 included as part of the 1982 joint tax return that $57,750 of the claimed $59,835 investment tax credit was attributable to Madison Recycling and that the claimed $56,657 business energy investment tax credit

was attributable to Madison Recycling.

With respect to the claimed $58,089 Madison Recycling loss, although that loss was set forth in Statement 2, that statement also showed the following respective claimed losses of the following partnerships, which accounted for $131,876 of the total claimed partnership losses of $189,965 shown in Schedule E:

| Name of Partnership | Partnership Loss |
| --- | --- |
| Kelly-Brock Drilling Partners 1981-1 | $64,753 |
| Odessey Partners 81 Limited Partnership | 57,087 |
| Matagorda Limited Partnership II | 10,036 |

Thus, Statement 2 showed a claimed loss from the Kelly-Brock Drilling Partners 1981-1 partnership that was greater than the claimed $58,089 Madison Recycling loss and a claimed loss from the Odessey Partners 81 Limited partnership that was approximately equal to the claimed $58,089 Madison Recycling loss.

With respect to the claimed Madison Recycling credits of $114,407, neither Schedule E, which had a notation to Statement 2, nor Statement 2 referred to Form 3468, the form included with the 1982 joint tax return in which the respective bases for any claimed investment tax credit and any claimed business energy investment tax credit and the computation of such respective credits were to be detailed. Form 3468 included as part of the joint 1982 tax return showed (1) a claimed $59,835 investment tax credit and (2) a claimed $56,657 business energy investment tax credit. That form did not, however, indicate the entity or

entities to which those respective claimed credits were attributable.

It is also significant that an examination of the education factor, the involvement in financial affairs factor, the evasiveness and deceit factor, and the lavish or unusual expenditures factor further supports a finding that a reasonably prudent taxpayer under petitioner's circumstances at the time of signing the 1982 joint tax return could not have been expected to know that the tax liability stated in that return was erroneous.

With respect to the education factor, there is no question that petitioner is highly educated.  However, at the time of the trial, petitioner did not have any education or work experience in tax, financial, or accounting matters.  We find nothing in the record regarding petitioner's education and experiences that would, or should, have alerted her to the understatement in the 1982 joint tax return.

With respect to the involvement in financial affairs factor, respondent concedes in the face of the instant record "that the record supports petitioner's contention that she had little involvement in her family's financial affairs."[24]

---

[24]We have found:  (1) Based on their respective personal and business backgrounds and experiences, petitioner and Mr. Korchak believed throughout their marriage that managing their family's finances should be Mr. Korchak's responsibility and that Mr. Korchak was better suited than petitioner to do so; (2) Mr. Korchak assumed the responsibility of managing their family's finances, and petitioner relied upon him to do so; (3) as part of

(continued...)

With respect to the evasiveness and deceit factor, peti-
tioner contends:

> Ernest [Mr. Korchak] secretly and effectively excluded
> petitioner from information concerning family finances.
> He even concealed in a subsequent year the loss of a
> $700,000.00 investment.  His policy of secrecy and not
> disclosing financial matters deceived the petitioner.

Respondent counters, and we agree on the record before us, that

Mr. Korchak was not evasive and did not deceive petitioner with

respect to their financial affairs.  Nonetheless, as discussed

supra note 24, with respect to the involvement in financial

affairs factor, petitioner was not involved in managing her

family's finances, making financial decisions for her family, or

the reporting of any tax consequences of such financial decisions

---

[24](...continued)
his responsibility for managing the family finances, Mr. Korchak
made all the family financial decisions; (4) Mr. Korchak did not
discuss those decisions with petitioner; (5) throughout their
marriage, petitioner was generally unaware of bank accounts or
brokerage or other investment accounts in Mr. Korchak's name
alone or in the names of Mr. Korchak and petitioner; (6) at all
relevant times, Mr. Korchak was responsible for opening and
reviewing all the family's mail, including bills, tax notices,
documents pertaining to investments and other financial matters,
bank statements, including any joint checking account statements,
and petitioner relied upon him to do so; and (7) petitioner did
not become aware of Mr. Korchak's Madison Recycling investment
until Feb. 2, 1986, when she and Mr. Korchak signed Form 872 with
respect to their taxable year 1982.  We have also found that
petitioner was not involved in the reporting of any tax conse-
quences of such financial decisions that were claimed in the
joint tax returns, including the 1982 joint tax return, that she
and Mr. Korchak filed.  In this connection, we have found that
petitioner's role in the preparation of such returns was limited
to providing Mr. Korchak with any Form W-2 and IRS information
returns that she received as well as any other tax-related
information that she had.

that were claimed in the joint tax returns, including the 1982

joint tax return, that petitioner and Mr. Korchak filed.

With respect to the lavish or unusual expenditures factor,

respondent concedes in the face of the instant record "that the

record does not reflect that the * * * taxes saved due to the

Madison loss deduction and investment tax credit led to signifi-

cant changes in petitioner's and Mr. Korchak's lifestyle or

spending patterns."[25]

---

[25]We have found:  (1) During 1981 and 1982, Mr. Korchak
received Halcon distributions totaling $1,539,269 and $466,309,
respectively; (2) petitioner and Mr. Korchak made a considered
judgment not to change their family's lifestyle in any way as a
result of Mr. Korchak's having received such distributions; and
(3) they made that judgment because they did not want to spoil
their children by having a lavish lifestyle.  Nothing in the
record suggests that the desire of petitioner and Mr. Korchak not
to spoil their children by having a lavish lifestyle was limited
to the Halcon distributions that Mr. Korchak received in 1981 and
1982.  Moreover, in petitioner's Form 12510 and petitioner's
attachment to petitioner's Form 12507, petitioner indicated, and
respondent does not dispute here, that Mr. Korchak, without
consulting her, invested the $92,970 refund claimed in the 1982
joint tax return in Riverside, which filed for bankruptcy in
1989, and that, as a result of that bankruptcy proceeding, Mr.
Korchak lost his entire $700,000 investment in that company.  In
addition, in Mr. Korchak's Form 12508, Mr. Korchak indicated, and
respondent does not dispute here, that Mr. Korchak invested the
$92,970 refund claimed in the 1982 joint tax return in a business
venture of his (namely, Riverside), which later failed.  With
respect to the refund of $92,970 claimed in the 1982 joint tax
return, petitioner testified that she had no specific recollec-
tion regarding that return, that she and Mr. Korchak usually
received tax refunds, and that she had no specific recollection
of the refund of $92,970 claimed in the 1982 joint tax return,
although there may have been such a claimed refund.  We are
unable to find on the record before us that at the time she
signed the 1982 joint tax return petitioner was aware of the
$92,970 refund claimed in that return.  Even if petitioner were
aware at that time of that claimed refund, that would not change

(continued...)

On the record before us, we find that a reasonably prudent taxpayer under petitioner's circumstances at the time of signing the 1982 joint tax return could not have been expected to know that the tax liability stated in that return was erroneous.

It is respondent's position that, even if the Court were to find, as we have, that a reasonably prudent taxpayer under petitioner's circumstances at the time of signing the 1982 joint tax return could not have been expected to know that the tax liability stated in that return was erroneous, petitioner nonetheless had a duty to investigate further whether the tax liability stated in that return was erroneous (duty to inquire). In support of that position, respondent states:

> Had petitioner reviewed the 1982 return, she would have discovered that she and Mr. Korchak were claiming a substantial loss and tax credit attributable to the Madison investment, as that information was clearly set forth in a schedule attached to the return. The Madison loss [of $58,089] and tax credit [totaling $114,407] were large enough to put her on notice that further inquiry was warranted to determine the legitimacy of those tax benefits. Thus, under the Bokum standard, she had reason to know of the understatement.

With respect to the claimed Madison Recycling credits of $114,407, we disagree with respondent's contention that those claimed credits were "clearly set forth in a schedule attached to the return." As discussed above, we have found that it was not obvious from reviewing Form 3468 included with the 1982 joint tax

---

[25](...continued)
our findings and conclusions herein.

return that $57,750 of the claimed $59,835 investment tax credit was attributable to Madison Recycling and that the claimed $56,657 business energy investment tax credit was attributable to Madison Recycling.

With respect to the claimed $58,089 Madison Recycling loss, we disagree with respondent's contention that that claimed loss was large enough to put petitioner on notice that further inquiry was warranted to determine whether it was proper. As discussed above, Statement 2 included with the 1982 joint tax return showed a claimed loss from the Kelly-Brock Drilling Partners 1981-1 partnership that was greater than the claimed $58,089 Madison Recycling loss and a claimed loss from the Odessey Partners 81 Limited partnership that was approximately equal to the claimed $58,089 Madison Recycling loss. We have found that the amount of the claimed $58,089 Madison Recycling loss would not have made that claimed loss stand out in relationship to the other partnership losses claimed in Statement 2.

Even if, as respondent argues, both the claimed $58,089 Madison Recycling loss and the claimed Madison Recycling credits of $114,407 had been "clearly set forth in a schedule attached to the return", as discussed above, at the time petitioner signed the 1982 joint tax return she must have had sufficient knowledge of the circumstances of the transactions in which Madison Recycling engaged that resulted in the understatement in that return

so as to permit her to inquire into the appropriate tax treatment of such transactions. See Bokum v. Commissioner, 94 T.C. at 148.[26] As also discussed above, at the time petitioner signed the 1982 joint tax return, she was not even aware of Mr. Korchak's Madison Recycling investment, let alone the circumstances of the transactions in which Madison Recycling engaged that resulted in Madison Recycling's erroneously claimed $704,111 loss and erroneously claimed $7 million basis for investment tax credit purposes and business energy investment tax credit purposes.[27]

On the record before us, we find that a reasonably prudent taxpayer under petitioner's circumstances at the time of signing the 1982 joint tax return would not have had a duty to investigate further whether the tax liability stated in that return was erroneous.[28]

---

[26]See also Hillman v. Commissioner, T.C. Memo. 1993-151.

[27]See supra note 23.

[28]The Court has held that a requesting spouse may satisfy a duty to inquire by questioning his or her spouse about the accuracy of a joint tax return and receiving a plausible explanation. See, e.g., Foley v. Commissioner, T.C. Memo. 1995-16; Estate of Killian v. Commissioner, T.C. Memo. 1987-365. Assuming arguendo that we had found that petitioner had a duty to inquire, she would have satisfied that duty by asking Mr. Korchak before she signed the 1982 joint tax return about the claimed $58,089 Madison Recycling loss and the claimed Madison Recycling tax credits of $114,407 and receiving assurance from him that that claimed loss and those claimed credits were proper. Mr. Korchak testified credibly, and we have found, that if petitioner had questioned him before she signed the 1982 joint tax return, he

(continued...)

Based upon our examination of the entire record before us, we find that in signing the 1982 joint tax return petitioner did not know, and had no reason to know, of the understatement in that return. On that record, we further find that petitioner satisfies section 6015(b)(1)(C) for her taxable year 1982.

Section 6015(b)(1)(D)

Pursuant to section 6015(b)(1)(D), petitioner must establish that, taking into account all the facts and circumstances, it is inequitable to hold her liable for the deficiency in tax attributable to the understatement in the 1982 joint tax return. The requirement in section 6015(b)(1)(D) is virtually identical to the requirement of former section 6013(e)(1)(D), and cases interpreting former section 6013(e) remain instructive to our analysis. Alt v. Commissioner, 119 T.C. at 313-314.

The factors that we consider in determining whether it would be inequitable for purposes of section 6015(b)(1)(D) are the same factors that we consider in determining whether it would be inequitable for purposes of section 6015(f). See id. at 316. One factor considered in determining whether it would be inequitable for purposes of section 6015(f) and thus for purposes of

---

[28](...continued)
would have assured her that the claimed $58,089 Madison Recycling loss and the claimed Madison Recycling credits of $114,407 were proper. We shall not penalize petitioner for failing to perform the act of asking Mr. Korchak about that claimed loss and those claimed credits where such an inquiry would have resulted in his assuring her that that claimed loss and those claimed credits were appropriate.

section 6015(b)(1)(D), see id., is whether in signing the tax return the requesting spouse did not know, and had no reason to know, of an understatement in that return, see Rev. Proc. 2003-61, sec. 4.03(2)(a)(iii)(B), 2003-2 C.B. 296, 298. Moreover, in determining whether a requesting spouse satisfies section 6015(b)(1)(D), we may consider, inter alia, whether such spouse satisfies section 6015(b)(1)(C).[29] We have found that petitioner satisfies section 6015(b)(1)(C) for her taxable year 1982. We further find that in signing the 1982 joint tax return petitioner did not know, and had no reason to know, of the understatement in that return for purposes of section 6015(b)(1)(D).

Other relevant factors that we may consider in determining whether a requesting spouse satisfies section 6015(b)(1)(D) include whether (1) the requesting spouse was deserted, divorced, or separated (marital status factor); (2) the requesting spouse would suffer economic hardship if relief were not granted (economic hardship factor); and (3) the requesting spouse made a good faith effort to comply with the tax laws for the taxable years following the taxable year to which the request for relief relates (tax compliance factor). See Washington v. Commissioner, 120 T.C. 137, 147 (2003); Alt v. Commissioner, supra at 314-316.

---

[29]See Halton v. Commissioner, T.C. Memo. 2005-209.

With respect to the marital status factor, petitioner and Mr. Korchak were still married and living together at the time of the trial.

With respect to the economic hardship factor, pursuant to Madison Recycling Associates v. Commissioner, T.C. Memo. 2001-85, respondent assessed against petitioner and Mr. Korchak a deficiency of $140,388 in tax for their taxable year 1982 and interest thereon as of October 3, 2003, of $1,107,797.85 resulting from the disallowance of the claimed $58,089 Madison Recycling loss and the claimed Madison Recycling tax credits of $114,407. If the Court were to deny petitioner's claim under section 6015, petitioner and Mr. Korchak would be jointly and severally liable for that assessed deficiency and that assessed interest, none of which had been paid as of the time of the trial. Moreover, pursuant to Korchak v. Commissioner, T.C. Memo. 2005-244, and the parties' stipulation to be bound, see supra note 3, if the Court were to deny petitioner's claim under section 6015, petitioner and Mr. Korchak would be jointly and severally liable for additions to tax for their taxable year 1982 under sections 6653(a)(1), 6653(a)(2), and 6659 of $7,019.40, 50 percent of the interest due on the assessed deficiency of $140,388, and $34,322.10, respectively.

Petitioner contends that at the time of the trial the total liability with respect to her taxable year 1982 "greatly exceeds"

$2 million.[30]  Respondent contends that at that time that liability was approximately $2 million.  Suffice it to say that the parties agree that at the time of the trial the total liability with respect to petitioner's taxable year 1982 was at least $2 million.  Moreover, interest as provided by law continues to accrue thereafter with the passage of time.  See sec. 6601.  Thus, the total liability for taxable year 1982 continues to increase with the passage of time (1982 total liability).

Respondent maintains, and petitioner does not dispute, that, because petitioner and Mr. Korchak were still married at the time of the trial, it is appropriate to consider the income, the assets, and the liabilities of both of them in determining whether petitioner would suffer an economic hardship if she were required to pay the 1982 total liability.  The parties agree that at the time of the trial the total value of the assets of petitioner and Mr. Korchak was $1,972,169.  The parties also agree that at that time the residence in which petitioner and Mr. Korchak were living that petitioner owned was subject to liabilities totaling $139,000.[31]

---

[30]In petitioner's December 15, 2004 memorandum that she submitted to respondent during the consideration by respondent's examiner of petitioner's claim under sec. 6015, petitioner indicated that, as of Dec. 13, 2004, the total liability with respect to her taxable year 1982 exceeded $2.5 million.

[31]See supra note 19.

If petitioner and Mr. Korchak were to use all of the assets owned at the time of the trial, they would be unable to pay even the $2 million of the liability for their taxable year 1982 that, at a minimum, the parties agree existed at that time. And they would be left with no assets to pay the balance of that liability, including the interest as provided by law that continues to accrue and that causes that liability to continue to increase. All that petitioner and Mr. Korchak would be left with to pay the balance of the 1982 total liability, as well as all of their basic reasonable living expenses,[32] would be petitioner's annual salary of $115,000 and Mr. Korchak's annual salary of $90,000 that they were receiving at the time of the trial.[33] Of course, those salaries would be subject to Federal and State income taxes and Social Security taxes, as required by law. Moreover, as of the time of the trial, petitioner intended to retire in 2007 at age 70.[34]

---

[32]The basic reasonable living expenses of petitioner and Mr. Korchak include the expenses with respect to the $139,000 of liabilities to which their residence that petitioner owned at the time of the trial was subject.

[33]During 2004, the year before the trial took place, in addition to the respective salaries of petitioner and Mr. Korchak, they received other income from various sources totaling $60,003. The record does not disclose how much, if any, income from such sources petitioner and Mr. Korchak expect to receive after 2004.

[34]Although Mr. Korchak testified that as of the time of the trial he had no intention of retiring, we note that he was 71 years old at that time.

On the record before us, we find that petitioner would suffer an economic hardship if she were required to pay the 1982 total liability.

With respect to the tax compliance factor, petitioner contends, and respondent does not dispute, that she complied with the tax laws for her taxable years following her taxable year 1982.

Based upon our examination of the entire record before us, we find that, taking into account all the facts and circumstances, it is inequitable to hold petitioner liable for the deficiency in, and additions to, tax (as well as interest thereon as provided by law) attributable to the understatement in the 1982 joint tax return.  On that record, we further find that petitioner satisfies section 6015(b)(1)(D) for her taxable year 1982.

Conclusion

Based upon our examination of the entire record before us, we find that petitioner is entitled to relief under section 6015(b) with respect to her taxable year 1982.[35]

We have considered all of the parties' contentions and arguments that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

---

[35]In light of our finding that petitioner is entitled to relief under sec. 6015(b) with respect to her taxable year 1982, we need not address petitioner's alternative claim for relief under sec. 6015(f) for that year.

To reflect the foregoing,

<u>Appropriate decisions for petitioner will be entered</u>.